**Abby Greenfield, OSB No. 243463**
abby@kedwards-law.com
**Katharine Edwards, OSB No. 173393**
attorney@kedwards-law.com
**LAW OFFICE OF KATHARINE EDWARDS, LLC**
P.O. Box 417
Hillsboro, Oregon 97123
Telephone: (503) 908-3589
Facsimile: (503) 241-2249

Of Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

Case No. 3:25-cv-00878-AB

**GORDON DEYOUNG,**

Plaintiff,

v.

**STATE OF OREGON, OREGON DEPARTMENT OF CORRECTIONS, WARREN ROBERTS, JOSEPH BUGHER, MICHAEL SEALE, HEIDI STEWARD, ASHLEY CLEMENTS, JUDY BRADFORD, NATE EICHHORST, FIRST NAME UNKNOWN FRANK, KELCIE MAIN, JOSHUA YBARRA, GARTH GULICK, R. KELLER, BRYON HEMPHILL, JOE WOODLAND, AMBER SUNDQUIST,** and **GARY NINMAN**

Defendants.

**FIRST AMENDED COMPLAINT**
(Title II of the ADA; Rehabilitation Act; 42 U.S.C. §1983: 8th, and 14th Amendments)

JURY TRIAL DEMANDED

Plaintiff Gordon DeYoung alleges as follows:

## PRELIMINARY STATEMENT

1. Plaintiff Gordon DeYoung brings this action to redress violations of Title II of the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C. §1201 *et seq*., violations of federal statutory rights pursuant to 42 U.S.C. § 1983, violations of Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701, *et seq.*(hereinafter, "The Rehabilitation Act"), and violations of the Eighth and Fourteenth Amendments to the United States Constitution by failing to provide adequate medical care while in custody of the Oregon Department of Corrections.

2. For years Defendants have repeatedly failed to properly address Plaintiff's chronic hearing loss and eye pain, subjecting Plaintiff to unnecessary pain, discomfort, and anxiety. Plaintiff's hearing loss and history of cholesteatomas in both ears were well-documented in ODOC's records. Despite repeated written and verbal requests for medical attention, Defendants either failed to address Plaintiff's concerns or imposed an unending cycle of medical care delays and unnecessary repetitive diagnostic work ups. Since 2022, Defendants have known that Plaintiff needs hearing aids for his diagnosed hearing loss, confirmed by audiologists at Idaho Elks Hearing and Balance Center (hereinafter, ELKs) on three separate occasions. Plaintiff's hearing loss makes him vulnerable to disciplinary action and endangerment solely because he frequently cannot hear what ODOC staff members or other prisoners are saying to him. In addition to Plaintiff's hearing loss, he suffers from frequent dizziness and vertigo spells, presumably from the damage inside his ears which Defendants have not properly addressed. At the time of this filing, Plaintiff has yet to receive hearing aids that were first approved by the Therapeutic Level of Care Committee (hereinafter, "TLC") in 2022. When Covid-19 struck, Plaintiff put his health on the line as a body spill orderly tasked with disinfecting the prison—

without proper personal protective equipment (PPE). Since then, Plaintiff has suffered from persistent dry eyes and pain that has been inadequately treated and insufficiently addressed by Defendants. Over the years, Plaintiff has consistently complied with the Defendants' orders and instructions while voicing his concerns about his significant and persistent health issues. Despite Plaintiff's efforts, Defendants have inflicted unnecessary distress on the Plaintiff by withholding and delaying necessary treatment. Defendants' failure to provide adequate care for Plaintiff's health conditions have caused them to worsen significantly and potentially irreversibly.

3. Plaintiff seeks damages, declaratory and injunctive relief, an award of compensatory damages and punitive damages in an amount to be determined at trial and an award of reasonable attorney fees and costs under 42 U.S.C. § 1983, 42 U.S.C. §12101 *et seq*., 29 U.S.C. § 701, *et seq.,*and the Eighth, and Fourteenth Amendments to the U.S. Constitution.

4. Plaintiff also alleges supplemental state law claims of negligence.

5. Plaintiff is currently in the custody of Oregon Department of Corrections ("ODOC") at Deer Ridge Correctional Institution ("DRCI").

6. Defendants are individuals who, during the time of Plaintiff's incarceration, have had authority and responsibility for his treatment, safety, custody, and care.

7. Plaintiff has fully exhausted his available administrative remedies.

8. Plaintiff filed a timely Tort Claim Notice.

9. Plaintiff seeks equitable relief, compensatory and punitive damages, declaratory and injunctive relief, as well as attorney fees and costs as set forth below.

## **JURISDICTION & VENUE**

10. Jurisdiction is conferred upon this Court by 28 U.S.C. §1331, federal question jurisdiction, and pursuant to 28 U.S. C §1343(a)(3) and (4), civil rights jurisdiction.

11. Venue is in the District of Oregon pursuant to 28 U.S.C. §1391(b) because the claim arose in this Judicial District and all Defendants are employed by ODOC, most recently at Deer Ridge Correctional Institution, which is located in Jefferson County, Oregon.

12. Plaintiff complied with the Tort Claims Act for claims under Oregon law.

**PARTIES**

13. Plaintiff Gordon DeYoung is a citizen of the United States. At all times material, Plaintiff was incarcerated in the custody of ODOC at Snake River Correctional Institution (SRCI) in Malheur County, Oregon, and at Deer Ridge Correctional Institution (DRCI) in Jefferson County, Oregon. Plaintiff is a qualified individual with a disability in that Plaintiff is hearing impaired. Plaintiff also suffers from vision impairment and eye dryness and pain.

14. Defendant State of Oregon operates the Oregon Department of Corrections (ODOC) which is an agency of the State of Oregon. ODOC owns, staffs, and operates prisons in Oregon, including SRCI and DRCI and is responsible for the inmates in these facilities. ODOC is a public entity subject to Title II of the ADA. ODOC is a recipient of federal financial assistance and subject to Section 504 of the Rehabilitation Act.

15. Defendant Warren Roberts was at all relevant times a medical doctor and Chief of Medicine at ODOC. Defendant Roberts is sued in his individual and official capacities.

16. Defendant Michael Seale is and was at all relevant times the Interim Chief of Medicine at ODOC. Defendant Seale is sued in his individual and official capacities.

17. Defendant Joseph Bugher was at all relevant times the Director of Health Services at ODOC. Defendant Bugher is sued in his individual and official capacities.

18. Defendant Heidi Steward is and was at all relevant times the Deputy Director of Health Services at ODOC. Defendant Stewards is sued in her individual and official capacities.

19. Defendant Ashley Clements is and was at all relevant times a nurse practitioner at SRCI. Defendant Clements is sued in her individual and official capacities.

20. Defendant Judy Bradford upon information and belief is and was at all relevant times a Nurse manager at SRCI. Defendant Bradford is sued in her individual and official capacities.

21. Defendant Nate Eichhorst upon information and belief was at all relevant times an optometrist at SRCI. Defendant Eichhorst is sued in his individual and official capacities.

22. Defendant Doctor Frank upon information and belief was at all relevant times a medical doctor at ODOC. Defendant Frank is sued in his individual and official capacities.

23. Defendant Kelcie Main is and was at all relevant times a grievance coordinator at SRCI. Defendant Main is sued in their individual and official capacities.

24. Defendant Joshua Ybarra is and was at all relevant times a grievance coordinator at DRCI. Defendant Ybarra is sued in his individual and official capacities.

25. Defendant Garth Gulick is and was at all relevant times a medical doctor at ODOC. Defendant Gulick is sued in his individual and official capacities.

26. Defendant R. Keller is and was at all relevant times a staff member at ODOC. Defendant Keller is sued in their individual and official capacities.

27. Defendant Bryon Hemphill was at all relevant times a medical doctor at ODOC. Defendant Hemphill is sued in his individual and official capacities.

28. Defendant Joe Woodland is and was at all relevant times the superintendent of SRCI. Defendant Woodland is sued in his individual and official capacities.

29. Defendant Amber Sundquist is and was at all relevant times the superintendent of DRCI. Defendant Sundquist is sued in her individual and official capacities.

30. Defendant Gary Ninman is and was at all relevant times the Inspector General of ODOC. Defendant Ninman is sued in his individual and official capacities.

31. At all times relevant, Defendant's employees, contractors, and supervisors, as their conduct is alleged herein, were acting within the course and scope of their employment with the defendant.

32. All defendants are sued in their individual and official capacity.

## FACTUAL BACKGROUND

33. Plaintiff has a significant history of cholesteatomas in both ears, a rare type of growth behind the ear drum. In 1997 Plaintiff had a right ear cholesteatoma removed and in 2006 Plaintiff had a left ear cholesteatoma removed. Since the removal of the cholesteatomas, Plaintiff's hearing loss has worsened and is frequently accompanied by bouts of dizziness and vertigo. Upon information and belief, beginning in May of 2020, Plaintiff was assigned to work as a body spill orderly without proper personal protective equipment (PPE) to protect his eyes from the strong cleaning solutions used, including Waxie 710 multi-purpose disinfectant cleaner. Since then, Plaintiff suffers daily from dry and painful eyes and has not found relief. Defendant has failed to properly address Plaintiff's serious health conditions which has left Plaintiff dangerously susceptible to further injury and suffering.

34. Plaintiff entered ODOC custody in 2012.

35. Plaintiff's health conditions and particular vulnerabilities are well documented in ODOC's records.

36. On or about May 21, 2019, the Therapeutic Levels of Care Committee (TLC) documented Plaintiff's diagnosis as "cholesteatoma hx. scar tissue." TLC approved the proposed

treatment of an otolaryngologist (hereinafter, "ENT") consult only if Defendant Gulick agreed an ENT was necessary.

37. On or about June 17, 2020, a progress note documented Plaintiff's long history of vertigo and dizziness which occurred at least once or twice a week.

38. Over a year later, on or about July 28, 2021, Plaintiff sent a kyte to Defendant Clements requesting to see an ENT because of chronic dizzy spells. Plaintiff detailed concerns that the dizziness may be due to inner ear issues and stated, "[a]ll I know is something is wrong – frankly it frightens me." The following day, on or about July 29, 2021, a medical staff member wrote, "medical response this am 7/29/21." The medical staff member's signature was illegible.

39. On or about September 29, 2021, TLC denied an ENT consult. The denial included the acronym "ACFUP". Upon information and belief, the acronym means a follow-up with Defendant Clements.

40. On or about October 31, 2021, Plaintiff wrote a kyte to Defendant Clements in which he complained of chronic dry eyes for over three months with little to no relief from prescription allergy eye drops.

41. On or about November 17, 2021, TLC approved a Videonystagmography (VNG) audiogram. The TLC committee approval form stated, "this test will show if pressure equalizing tubes would help."

42. On or about January 5, 2022, a Provider recommendation was made for hearing aids.

43. On or about March 1, 2022, Plaintiff sent a kyte to Defendant Clements stating that his dizziness was "off the hook" and asking when the ENT appointment is scheduled for. Plaintiff emphasized that TLC had approved the appointment with Otolaryngologist Dr. Steven

Reich back in November 2021. The response to Plaintiff's kyte, dated the same day, stated, "you have an upcoming audiogram appt." The medical staff member's signature was illegible.

44. On or about March 4, 2022, Dr.Bellucci, the audiologist at Idaho Elks Hearing and Balance Center (ELKs) diagnosed Plaintiff with "moderate to moderately-severe mixed hearing loss" in Plaintiff's right ear and "moderate rising to mild sensorineural hearing loss" in Plaintiff's left ear. Importantly, Dr. Belucci stated in the diagnosis that "this degree of hearing loss can negatively impact the patient's quality of life and ability to communicate in variety of environments."

45. Dr. Belucci's evaluation included the following recommendations: ENT consultation, vestibular physical therapy, neurology consultation, hearing aid consultation to "discuss appropriate amplification options considering significant degree of hearing loss."

46. Later that same month, on or about March 21, 2022, Plaintiff wrote a kyte to Defendant Clements stating that he has suffered from unresolved dizziness for two years and reminding Defendant Clements that Dr. Belucci recommended an ENT consult and physical therapy. Plaintiff stated, "I have a hard time 'functioning' due to dizziness and it's been a long time." That same day a medical staff member replied, "You are scheduled to see your provider please ask her about this while at your visit." The medical staff member's signature was illegible.

47. On or about April 28, 2022, Plaintiff submitted a kyte to Defendant Clements requesting an optometrist appointment for his chronic dry eyes. Plaintiff described the pain as "swimming in a chlorinated pool all day" A response was written on the same day which stated, "talk to Clements at your next appointment." The medical staff member's signature was illegible.

48. On or about May 11, 2022, over two months since Plaintiff's appointment with Dr. Belucci, TLC approved all of Dr. Belucci's recommendations.

49. On or about June 3, 2022, Plaintiff wrote a kyte to Defendant Clements explaining that "none of the three prescription eye drops help with my eye issue, I have no more tears?"

50. On or about July 1, 2022, Plaintiff once again wrote a kyte to Defendant Clements stating his belief that his eye issues stem from the use of Waxie 710 solution during "covid decontamination work" while he was a "body spill orderly" from May 2020 until September 2020. Plaintiff also discovered that the ingredients in the eye drops prescribed by an optometrist are the same as those prescribed by Defendant Clements—neither of which have worked. He requested another appointment with the optometrist.

51. On or about July 13, 2022, TLC denied OCuSOFT Lid Scrubs and instead opted for issuing baby shampoo.

52. The following day, on or about July 14, 2022, Plaintiff wrote a kyte to Defendant Clements requesting to see an ophthalmologist rather than an optometrist. The reason being that the current prescriptions were not working, and Plaintiff could no longer produce tears. A response was written the same day which stated, "you see your provider later this month, talk to them about it at this time." The medical staff member's signature was illegible.

53. The next day, on or about July 15, 2022, Plaintiff wrote a kyte to TLC stating that baby shampoo was not a part of his recommended treatment plan, and he was under the impression Defendant Frank had prescribed "ocu soft lid scrubs." The response to Plaintiff's kyte stated, "TLC did not approve the lid scrub wipes . . . Give the shampoo and anti-biotic ointment a chance." The medical staff member's signature was illegible.

54. On or about July 18, 2022, Plaintiff sent a kyte to Defendant Clements which stated, "[m]y eyes are miserable the optometrist here prescribed the same drops you did – they

don't work and I don't really believe what he had to say." Nurse Rodriguez stated in their response, "You have an appointment with the provider to discuss the issue."

55. On or about July 28, 2022, TLC approved hearing aids. The approval was reviewed by Defendants Gulick, Frank, Clements, and Roberts.

56. On that same day, July 28, 2022, Plaintiff was seen by ENT-Otolaryngologist Dr. Steven Reich who noted that he had seen Plaintiff about seven years ago for hearing loss and dizziness. Dr. Reich wrote, "Hearing loss is as expected for the types of surgery that he had and unlikely that it can be improved with any kind of surgery. Good hearing aid candidate, however."

57. On or about August 8, 2022, Plaintiff wrote a kyte to Defendant Hemphill that eye drops and baby shampoo were not helping his eyes. Plaintiff explained that he believes the eye irritation and dryness is a result of using "waxie 710 cleaner" from on or about May 2020 to September 2020. The response stated, "[d]o not put 710 in your eyes, please." The medical staff member's signature was illegible.

58. On or about August 19, 2022, Plaintiff wrote a kyte to Defendants Clements and Hemphill explaining that his eyes are "miserable, burnt, itch hurt blurry." The response stated, "you are scheduled to see the nurse." The medical staff member's signature was illegible.

59. On or about September 16, 2022, Plaintiff wrote a kyte to Defendant Clements and explained that three different optometrists had prescribed ineffective ointments. Plaintiff shared anxiety about his eye function deteriorating since the issue had been ongoing since January 2021. The response stated, "you have dry eyes – anything other than stye ointment, visine, or alaway need TLC approval." The medical staff member's signature was illegible.

60. A few days later, on or about September 21, 2022, Plaintiff wrote a kyte to "reviewing nurse" restating that three different optometrists had been unable to provide relief for

his eye problems and that the ointments he's had access to do not work. Plaintiff requested an ophthalmologist appointment and stated that Dr. Hemphill had planned to refer him to one, but he had not heard back. There was no response until October 3, 2022, in which the medical staff member stated, "I will ask the TLC." The staff member's signature was illegible.

61. On or about September 21, 2022, TLC approved Thera tears eye drops.

62. On or about October 26, 2022, TLC denied an ophthalmologist appointment.

63. Upon information and belief, TLC approved ELKS hearing aids on or about October 26, 2022. The written year is somewhat illegible.

64. On or about November 15, 2022, Plaintiff wrote a kyte to Defendant Clements requesting to see an "actual eye doctor" citing concerns about three different optometrists providing three different reasons for Plaintiff's eye pain, none of which resolved his issues.

65. On or about November 24, 2022, Plaintiff wrote a kyte to Defendant Clements stating that his eye issues persisted an hour after using eyedrops. The response stated, "sick call scheduled." The medical staff member's signature was illegible.

66. On or about November 27, 2022, Defendant Eichhorst wrote a letter to Plaintiff explaining that optometrists can diagnose diseases and recommended Plaintiff finish a six-week course of fish oil supplements.

67. On or about November 30, 2022, Plaintiff wrote a kyte to Defendant Eichhorst in which Plaintiff listed the various ingredients in Waxxie 710 that could contribute to his eye pain. He referred to their last appointment together in which "you [Eichorst] didn't even glance at them." Plaintiff expressed "very little confidence" in his diagnosis and treatment options. On December 2, 2022, Defendant Eichhorst responded, "Mr. DeYoung, At this time I have nothing more to add."

68. On or about January 5, 2023, Plaintiff was once again seen at ELKs. Samuel

Peterson, Au.D, F-AAA, found that Plaintiff's hearing had not significantly changed since the testing done at ELKs on March 4, 2022. Once again, the report emphasized that, "[t]his degree of hearing loss can negatively impact the patient's quality of life and ability to communicate in a variety of environments." Audiologist Peterson recommended "binaural amplification" and provided a cost quote to SRCI.

69. That same day, in a Provider's Returning Information document dated January 5, 2023, the recommendation for "hearing aids to overcome hearing loss" was signed by the community provider, ODOC nurse, and ODOC provider. All signatures on the form are illegible.

70. On or about January 9, 2023, Plaintiff wrote a kyte to Defendant Clements, describing "painful blurry issues and headaches." Plaintiff further explained that the Refresh eye drops provide short term relief but not long enough to get through the day. Nurse Rodriguez responded that Plaintiff is scheduled for sick call.

71. On or about January 18, 2023, TLC approved the ELKs hearing aids.

72. On or about February 3, 2023, Plaintiff wrote a kyte to Defendant Clements inquiring as to when he would receive his hearing aids. Plaintiff explained that the first hearing test was "in March 2022" and that the most recent test was taken a few weeks ago. Three days later, on February 6, 2023, an ODOC staff member identified by the last name Williams, who upon information and belief is a nurse, confirmed that Plaintiff would continue care with ELKs by stating, "You will continue to follow-up with ELKS about your hearing aids."

73. On or about February 20, 2023, Plaintiff wrote a kyte to Defendants Eichhorst and Clements stating that the canteen fish oil had not helped his dry eyes even with twice daily use as instructed. Additionally, Plaintiff emphasized that the constant burning sensation and headaches

made it difficult to do his call center job. Defendant Eichhorst responded on February 23, 2023, stating, "you have chronic dry eye that is managed and not 'cured.' Mild discomfort is part of the presentation. Computer eye strain is a separate etiology. This is not problematic enough to warrant an outside referral."

74. That same day, Plaintiff submitted a grievance dated February 20, 2023, pertaining to an incident on or around September 2020 with the Complex I Security Sergeant. Plaintiff stated that after his position as a body spill orderly had ended, the Complex I Security officer took his work packets which also contained Plaintiff's personal journal that detailed, among other things, his experience as a body spill orderly. Plaintiff asked for his personal property to be returned.

75. Plaintiff received a denial of his grievance on or about March 7, 2023, because "grievances must be received by the institution grievance coordinator or designee within 14 calendar days from the date of the incident or issue being grieved . . .". In his grievance appeal dated March 11, 2023, Plaintiff explained that the journal contained dates, times, and descriptions of his body spill orderly call outs. Plaintiff voiced concern that the journal was "thrown away due to that very reason" and that a "description of duties performed" could be a potential liability to DOC.

76. The grievance appeal was denied March 14, 2023.

77. Plaintiff filed another grievance on or about March 4, 2023, grieving "the administration or whoever is responsible for SRCI" with the incident date being June 2020 to present. In the grievance Plaintiff detailed his experience as the lead body spill orderly shortly after Covid-19 became rampant at SRCI. Plaintiff explained that "approximately two months prior to the Covid-19 virus arriving here at SRCI, the N-95 masks and goggles were removed

from the body spill carts . . .”. Without proper personal protection equipment (PPE) Plaintiff became the “1st line of defense” working in “complex 1 and both quarantine areas located within the infirmary and special housing.” Plaintiff described the PPE available as a Tyvek suit with a broken zipper held together with band aids and a homemade mask he created by ripping a T-shirt. Plaintiff sprayed Waxxie 710 for hours making it “impossible not to get soaked in the Waxxie 710.” At the conclusion of Plaintiff’s grievance, he requested his eye issues to be properly addressed in light of the fact that the Waxxie 710 was not properly diluted, and that Plaintiff was exposed to the cleaning solution’s chemicals without access to proper PPE.

78. Upon information and belief, CO Christopher Thornhill removed N-95 masks and protective eye goggles from every single body spill cart about a month before the Covid-19 pandemic. Even prior to the pandemic, the N-95 masks and goggles were supposed to be a permanent part of the required equipment inventory in each cart.

79. Upon information and belief, CO Thornhill, in the presence of CO Bennet, told Plaintiff that he was the one who removed the goggles and N-95 masks and that they would only be provided when needed.

80. The N-95 masks and protective eye goggles were not provided when needed.

81. The grievance was denied March 23, 2023.

82. On or about March 9, 2023, Plaintiff grieved Defendant Eichhorst and the Optometry Department at SRCI stating, “I’ve exhausted my options with OD Eichhorst” and requested an “unbiased appointment with an outside ophthalmologist.” According to the stamp on the grievance, the SRCI Grievance Office received it on March 23, 2023, and returned it for correction. At the time of this filing, Plaintiff does not currently possess the grievance response or any related appeals. Upon information and belief, the grievance was corrected and resubmitted. Under the applicable grievance and appeal timelines, a response

is issued within 35 calendar days, after which the adult in custody has 14 calendar days to file an appeal.[1] The institution then has 35 calendar days to respond to the initial appeal, followed by an additional 14-day period for the adult in custody to submit a final appeal, with ODOC allotted another 35 calendar days to respond.[2] Based on this timeline, and upon information and belief, the grievance process was completed after May 22, 2023.

83. On or about April 14, 2023, Plaintiff wrote a kyte to Defendant Clements explaining that his eye pain, blurred vision, and headaches remained unchanged since following the recommendations of Defendant Eichhorst of fish oil supplements and Refresh Celluvisc drops. The same day, a medical staff member replied, "It goes up for TLC for the Dr.'s to approve different eye [illegible word]. We should know Thursday if it was approved." The staff member's signature was illegible.

84. On or about April 16, 2023, Plaintiff submitted a kyte to Defendant Clements inquiring as to when he would receive the hearing aids approved by TLC almost a year ago on or about May 11, 2022. That same day, a medical staff member responded, "you will be scheduled for a chart review." The staff member's signature was illegible.

85. On or about April 19, 2023, Plaintiff wrote a kyte to Defendant Clements concerning the "sudden cancellation of [his] Refresh eye drops." Plaintiff expressed worry that his disagreements with Defendant Eichorst's treatment plans resulted in losing access to the eye drops. Plaintiff acknowledged that he had written kytes about Refresh celluvisc drops only working part of the day but that "at least it was something." Ten days later, a medical staff member responded to Plaintiff's concerns stating, "you have an appointment with optical on 5/4/23." The staff member's signature was illegible.

---

[1] OAR 291-109-0205

[2] *Id.*

86. On April 21, 2023, Plaintiff wrote a kyte to Defendant Clements requesting medication and treatment for his eyes. Defendant Eichhorst responded on April 25, 2023, "you will be scheduled for a follow up."

87. Plaintiff submitted a grievance dated April 22, 2023, once again explaining that the Refresh Celluvisc lubricant eye gel's prescription had expired and needed to be renewed.

88. Two days later, on or about April 24, 2023, Plaintiff wrote a kyte to Defendant Clements describing his eye pain as feeling "raw." Plaintiff emphasized that he did not need sick call but a treatment plan.

89. Two days later, on or about April 26, 2023, TLC denied the renewal of Celluvisc drops.

90. On or about May 17, 2023, TLC also denied Refresh Artificial Tears.

91. A little over a month later, on or about May 29, 2023, Plaintiff wrote a kyte to "medical (boss)" explaining that he has waited over a year for hearing aids from ELKS. The next day a medical staff member wrote, "Thank you for your patience. You have to be fitted for Elks hearing aids. You are scheduled then you have to wait for your appt." The staff member's signature was illegible.

92. On or about July 5, 2023, TLC denied approval of artificial tears. A staff member wrote on the TLC communication, "you need to purchase from canteen." The staff member's signature was illegible.

93. On or about July 19, 2023, Plaintiff wrote a kyte to Defendant Clements highlighting the kytes he had addressed to them on February 3, 2023, April 16, 2023, and May 29, 2023, in which he had to repeatedly ask for the appointment to be fit with hearing aids. Plaintiff once again reminded Defendant Clements that hearing aids had been approved over a year ago, on or about May 11, 2022. A medical staff member responded the same day stating,

"not yet scheduled. You can discuss at next provider visit in mid. August." The staff member's signature was illegible.

94. Plaintiff filed a grievance dated July 20, 2023, regarding the extreme delay in receiving hearing aids that were approved by TLC on or about May 11, 2022—in other words, fourteen months had passed. All Plaintiff asked for in the grievance was to receive the hearing aids. Notification that the grievance was accepted and sent for a response was dated August 2, 2023. The notification specifically states, "you should expect a response within 35 days of the date of this notice." On or about September 7, 2023, Plaintiff submitted a grievance appeal because he had not received a response. A late notice dated September 19, 2023, stated, "this letter is to notify you that response to above numbered complaint will be delayed. It was determined that further review is needed to appropriately respond to your concerns. DOC will respond once our review is complete."

95. On August 3, 2023, Plaintiff submitted a kyte to "OD Eichhorst" and "Reviewing Nurse" stating that after following Defendant Eichhorst's recommended treatment plan for two months, he continues to suffer from daily pain and discomfort. Defendant Eichhorst responded on August 28, 2023, "schedule F/U Dr. Eichhorst within 3 weeks."

96. On or about August 25, 2023, Defendant Bugher responded by letter to Plaintiff's grievance appeals for artificial tears which stated, "I support the medical opinion of Dr. Warren Roberts, Chief Medical Director . . . You are scheduled for a TLC consult this week regarding approval of Restasis eye drops."

97. On or about October 11, 2023, Defendant Keller wrote a letter to Plaintiff explaining that "we are presently in the process of getting your hearing aids approved with the Therapeutic Level of Care (TLC) Committee due to the time lapse between approvals. Once completed, you will receive notification on the next steps."

98. On or about January 17, 2024, Plaintiff submitted a kyte to Defendant Clements once again asking about when he would receive the hearing aids that had been approved by TLC over 20 months ago. Plaintiff reiterated that hearing aids were first approved by TLC on or about May 11, 2022, and again on or about January 1, 2023, yet Plaintiff had not received any updates since a letter signed by Defendant Keller and Defendant Bradford that medical was in the process of getting approval from TLC. A medical staff member responded the same day, "you are scheduled watch your call outs." The staff member's signature was illegible.

99. That same day, on January 17, 2024, Plaintiff wrote a second kyte to Defendant Clements requesting, among other things, to be seen by an ophthalmologist. A medical staff member responded the same day, "you are scheduled with your eye doctor." The staff member's signature was illegible.

100. On or about February 20, 2024, Plaintiff wrote a kyte to Defendant Main asking for a new hearing-impaired sticker. Plaintiff once again informed Defendant Main that he does not have his approved hearing aids yet. A response to the kyte was written the same day and stated, "You will need to contact health services to request a hearing test, hearing aids, etc. Once Health Services approves, we can issue the sticker." The staff member's signature was illegible.

101. Plaintiff once again went to ELKs on or about March 19, 2024, in which Audiologist Samuel Peterson noted that Plaintiff's hearing "has not changed significantly when compared to testing from 1/2/2023." Importantly, for the *third time,* a medical professional at ELKs wrote, "This degree of hearing loss can negatively impact the patient's quality of life and ability to communicate in a variety of environments."

102. Audiologist Samuel Peterson recommended that Plaintiff receive "appropriate biaural amplification."

103. On or about March 27, 2024, TLC approved Plaintiff's hearing aids and Restasis

eye drops.

104. On or about April 29, 2024, Plaintiff wrote a kyte to Defendant Eichhorst once again inquiring as to whether the Waxie 710 cleaning solution could be the cause of his eye condition. Plaintiff requested an outside appointment with an ophthalmologist. An ODOC staff member identified as James Bradt, who upon information and belief, is employed as a medical doctor at ODOC, responded the same day and stated, “dry eye can have many causes I would like to bring you in for an ocular health check in the next couple months to discuss this as well as referrals with you further.”

105. On or about October 4, 2024, Plaintiff was moved from SRCI to DRCI.

106. On or about October 5, 2024, Plaintiff submitted a non-emergency health care request for hearing impaired stickers for his ID and cell. Plaintiff emphasized that he was still waiting for the hearing aids that were approved by the SRCI TLC committee three different times, the most recent being March 2024. A medical staff member responded, “Please kyte Mr. Ybarra for the stickers. The staff that is working on the hearing aids will check into the hearing aids when return from training.” The staff member’s signature was illegible.

107. On or about October 25, 2024, *seven months* after Plaintiff’s third hearing test, Plaintiff once again wrote a kyte to medical explaining that TLC had approved hearing aids on three different occasions and that he had undergone three hearing tests but had not received hearing aids. Plaintiff explained that as a result of not having hearing aids he’s had “run ins with security for either being too loud or not hearing them.” Two days later a medical staff member wrote, “we are currently working on getting the hearing aids.” The staff member’s signature was illegible.

108. Plaintiff also wrote a kyte to Defendant Main at Behavioral Health Services (BHS) on or about October 25, 2024, to explain that his hearing impairment is increasing his

anxiety. Plaintiff referenced a time where he failed to hear a CO's question to him in chow hall. Plaintiff explained that for the past six months he's had to go to medline on a nightly basis for valium because of the anxiety caused by his hearing issues. In addition, Plaintiff kyted Defendant Ybarra, the grievance coordinator, "about 10 days ago for the ADA hearing impaired sticker for the back of [his] ID" and Plaintiff had not received an answer. A note dated October 30, 2024, stated "was seen today 10-30-24." The staff member's signature who wrote the note was illegible.

109. On or about December 4, 2024, Plaintiff submitted a non-emergency healthcare request because his right ear kept making cracking sounds that were different from what he's grown accustomed to. Plaintiff emphasized that he is still waiting for hearing aids after three different TLC approvals. The following day, on or about December 5, 2024, a medical staff member wrote in the comments, "you will need to send a kyte for nurse sick call." The staff member's signature was illegible.

110. On or about January 6, 2025, Plaintiff submitted a non-emergency healthcare request explaining, among other things, the results from his past three hearing tests and concerns about a hole in his left ear drum recently noted by his medical provider, Joanne Boisvert. In the comments section of the form, dated February 20, 2025, Plaintiff was informed that ELKs "requires hearing aids to be issued within 6 months of testing" and because his last hearing evaluation at ELKs was on March 19, 2024, Plaintiff will need to start with "Audicus testing." The staff member's signature was illegible.

111. On or about January 18, 2025, Plaintiff submitted a non-emergency healthcare request for a referral to an outside ENT because Provider Boisvert observed a hole in his left ear drum. The following day, on or about January 19, 2025, a comment stated, "your request has been scheduled with TLC." The staff member's signature was illegible.

112. On January 28, 2025, TLC approved an ENT referral for "history of mastoidectomy and TM perforation."

113. Upon information and belief, in mid-February 2025, Plaintiff was issued a 4-hour cell-in because he could not hear "call-out" and was making his bed rather than sitting on it. Plaintiff relies on his vibrating watch to prepare for call-out and on that day, the call-out was earlier than Plaintiff set his watch to.

114. Upon information and belief Plaintiff was issued two additional cell-ins lasting 16 hours and 24 hours, respectively, in March 2025 due to missing count after it was called earlier than Plaintiff anticipated, and therefore he could not hear the orders.

115. On or about April 3, 2025, Plaintiff did not receive his eyedrops at medline because the prescription order had expired without a scheduled chart review.

116. Upon information and belief Plaintiff did not receive his prescription eyedrops until on or about April 17, 2025.

117. On or about the last week of April 2025, Plaintiff underwent a fourth hearing test which once again confirmed significant hearing loss.

118. On or about May 2, 2025, Plaintiff was issued an 8-hour cell-in for failing to hear a corrections officer instruct him to go into his cell.

119. Upon information and belief, Defendant Bugher was responsible for reviewing medical care and medical decisions by Health Services staff throughout ODOC when individuals in custody file second appeals to denied medical grievances.

120. Upon information and belief, Defendant Steward is responsible for reviewing medical care and medical decisions by Health Services staff throughout ODOC when individuals in custody file second appeals to denied medical grievances.

121. Upon information and belief, Defendant Roberts was head of the TLC Committee

and has final authority on all decisions presented to the TLC Committee.

122. Upon information and belief, Defendant Seale is head of the TLC Committee and has final authority on all decisions presented to the TLC Committee.

123. Upon information and belief, Defendant Roberts was responsible for training and supervising all subordinate medical staff and ensuring proper medical care for all adults in ODOC custody.

124. Upon information and belief, Defendant Seale is responsible for training and supervising all subordinate medical staff and ensuring proper medical care for all adults in ODOC custody.

125. Upon information and belief, Defendant Bugher was responsible for training and supervising all subordinate Health Services staff and ensuring proper care for all adults in ODOC custody.

126. Upon information and belief, Defendant Steward is responsible for training and supervising all subordinate Health Services staff and ensuring proper care for all adults in ODOC custody.

127. Upon information and belief, Defendant Woodland is responsible for training, supervision, and oversight of all employees at SRCI and ensuring that adults in SRCI's care, custody, and control are treated lawfully and humanely at all times.

128. Upon information and belief, Defendant Sundquist is responsible for training, supervision, and oversight of all employees at DRCI and ensuring that adults in DRCI's care, custody, and control are treated lawfully and humanely at all times.

129. Upon information and belief, Defendant Eichhorst was responsible for facilitating follow-up care, evaluation, and treatment for patients at SRCI, including coordinating and communicating with other medical providers.

**COUNT I**
**(Americans With Disabilities Act-Title II: 42 U.S.C. §12131 et seq.)**
**(Against Defendants ODOC and State of Oregon)**

130. Plaintiff realleges all previous paragraphs as if more fully set for herein.

131. At all times material, Defendants ODOC was a public entity that provides public service for the purpose of, and subject to, the ADA.

132. Plaintiff has a physical hearing impairment that substantially limits one or more of his major life activities. Plaintiff is a qualified individual with a disability under the ADA.

133. At all relevant times, Defendants were aware of Plaintiff's hearing impairment.

134. Defendants discriminated against Plaintiff by excluding him from or denying him an equally effective opportunity to participate in the benefits of Defendants' services, programs, or activities.

135. Defendants denied Plaintiff the benefits of Defendants' services and programs by failing to provide adequate communication services, including proper auxiliary aids.

136. Defendants failed to follow through and complete assessments of Plaintiff's disability or the auxiliary aids or accommodations that would ensure effective communication and equal participation in and benefit from ODOC services.

137. Defendants' actions were intentional and conducted with a deliberate indifference to Plaintiff's rights.

138. Defendants knew that Plaintiff had repeatedly requested proper hearing aids for communication and daily life and disregarded Plaintiff's requests through repeated delays.

139. As a result of Defendants' unlawful actions, Plaintiff suffered from, and continues to suffer from anxiety, distress, isolation, and impairment of his personal dignity and right to be free from discrimination or interference with his statutory rights.

140. Plaintiff is entitled to injunctive relief as against Defendants, including, but not limited to, an order prohibiting Defendants from continued discrimination against people with disabilities by refusing to provide adequate auxiliary aids to hearing-impaired persons, and an order requiring Defendants to conduct individualized assessments of disabled prisoners' disabilities and the auxiliary aids or accommodations that would ensure effective communication and equal enjoyment of ODOC services.

141. Plaintiff is entitled to compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses in an amount to be proven at trial. Plaintiff should also be entitled to award an of his economic loss in an amount to be proved at trial.

142. Plaintiff is entitled to an award of punitive damages in an amount to be fixed by a jury at the time of trial.

143. Pursuant to 42 U.S.C. §§ 1988 and 2000e-5, Plaintiff is entitled to an award of attorney's fees, expert witness fees, and all costs incurred.

**COUNT II**
**(Section 504 of the Rehabilitation Act of 1973)**
**(Against Defendants ODOC and State of Oregon)**

144. Plaintiff re-alleges all prior paragraphs.

145. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794, prohibits discrimination against people with disabilities by recipients of federal funding, and provides "no otherwise qualified handicapped individual . . . shall, solely by reason of her or his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

146. Plaintiff is hearing impaired, and accordingly, is a qualified individual with a disability or handicap under the Rehabilitation Act.

147. Plaintiff has a physical impairment that substantially limits one or more major life activities including hearing and communicating; Plaintiff has a record of such impairment; and Defendants ODOC and State of Oregon regarded Plaintiff as having such impairment.

148. At all times material, Defendants are recipients of federal financial assistance for their programs and activities.

149. Defendant's actions and omissions as described above violated Plaintiff's rights under the Rehabilitation Act by excluding him or denying him the benefits of their services on the basis of a disability.

150. Defendants intentionally discriminated against Plaintiff through its actions and omissions alleged above by being aware of their obligations to address Plaintiff's needs and federally protected rights, and by failing to act at that time when it was required to protect his rights.

151. Specifically, Defendants denied Plaintiff effective communication by refusing to provide him with proper auxiliary aids.

152. Plaintiff sustained emotional distress and damages due to Defendants' violations of the Rehabilitation Act.

153. Pursuant to Section 505 of the Rehabilitation Act, Plaintiff is entitled to compensation for his damages and an aware of attorney fees and costs.

## COUNT III

**(42 U.S.C. §1983 – Eighth Amendment – Delay and Denial of Essential Medical Care)**
**(Against Defendants ODOC, Roberts, Seale, Bugher, Steward, Clements, Bradford, Eichhorst, Frank, Main, Ybarra, Gulick, Keller, Hemphill, Woodland, Sundquist, and Ninman)**

154. Plaintiff realleges all previous paragraphs as if more fully set forth herein.

155. Plaintiff is entitled to timely and adequate medical care as part of his

Constitutionally guaranteed conditions of confinement pursuant to the Eighth Amendment to the United States Constitution. Failure to provide timely and adequate medical care is a violation of the Eighth Amendment prohibitions against cruel and unusual punishment.

156. Plaintiff was denied timely, adequate, and proper medical care when Defendants failed to address his hearing loss in a timely manner.

157. Plaintiff was denied timely, adequate, and proper medical care when Defendants failed to address his eye pain in a timely manner.

158. Plaintiff was denied timely, adequate, and proper medical care when Defendants failed to respond to his health concerns that were consistently communicated to the appropriate staff and through the appropriate channels via kytes and grievances.

159. Plaintiff was denied timely, adequate, and proper medical care when Defendants repeatedly required Plaintiff to do auditory tests for hearing aids he never received.

160. Plaintiff was denied timely, adequate, and proper medical care when Defendants failed to provide hearing aids that were approved by TLC on three separate occasions.

161. Plaintiff was denied timely, adequate, and proper medical care when Defendants refused to identify any correlation between Plaintiff being forced to use harsh chemical cleaning products without proper PPE and Plaintiff's subsequent chronic eye pain and dryness.

162. Plaintiff was denied timely, adequate, and proper medical care when Defendants prescribed medications proven to be ineffective for managing Plaintiff's eye pain.

163. Plaintiff was denied timely, adequate, and proper medical care when Defendants refused to refer Plaintiff to an ophthalmologist.

164. Plaintiff was denied timely, adequate, and proper medical care when Defendants failed to properly address Plaintiff's grievances and appeals, and simply "rubber stamped" denials on his grievance appeals.

165. Defendants' actions have contributed to worsening of Plaintiff's condition and caused possibly irreversible harm.

166. The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

167. Plaintiff is entitled to damages to compensate him for these injuries.

168. Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

169. Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT IV

**(42 U.S.C. §1983 – Eighth Amendment – Failure to Adequately Train & Supervise Subordinate Staff)**
**(Against Defendants Woodland, Sundquist, Roberts, Bugher, Seale, Steward, Ninman, Bradford, Main, and Ybarra)**

170. Plaintiff re-alleges all prior paragraphs as though fully restated herein.

171. The knowing and willful acts and omissions of Defendants, Woodland, Sundquist, Roberts, Bugher, Seale, Steward, Ninman, Bradford, Main, and Ybarra alleged herein constitute deliberate indifference to the substantial risk of serious harm to Plaintiff as a result of inadequate and delayed medical care in violation of the Eighth and Fourteenth Amendments to the United States Constitution, by failing to properly and adequately train and supervise subordinate employees, and tacitly allowing denial and delay of necessary medical care.

172. The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

173. Plaintiff is entitled to damages to compensate him for these injuries.

174. Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

175. Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT V

**(Negligence)**
**(Against Defendant ODOC)**

176. Plaintiff re-alleges all previous relevant paragraph as if fully stated herein.

177. Defendants knew or should have known that Plaintiff's persistent hearing loss required hearing aids.

178. Defendants knew or should have known the significant risks to Plaintiff's health, safety, and quality of life by failing to provide hearing aids.

179. Defendants knew or should have known that delaying audiologist recommendations would be a significant risk to Plaintiff's health and well-being.

180. Defendants knew or should have known the significant and long-term risks to Plaintiff's health by failing to provide proper PPE when using harsh chemical cleaning agents.

181. Defendants knew or should have known that that Plaintiff's chronic dry and painful eyes required consultation with an eye specialist.

182. Plaintiff has suffered physical harm and severe physical and mental pain and suffering.

183. ODOC failed to use reasonable care in documenting Plaintiff's condition and to ensure adherence by all staff, and to ensure that Plaintiff received proper and timely medical care in ODOC custody. ODOC's conduct was negligent.

184. Defendant ODOC owes plaintiff a higher standard of care because of the nature of incarceration. As wards of the State, Defendant ODOC manages all aspects of Plaintiff's daily

life and decides with whom he will interact, where he will work, live, sleep, bathe, use the toilet, recreate, etc. Had Plaintiff been a free person, he would have been able to seek out timely medical care, but Defendant ODOC prevented Plaintiff from being able to take those measures.

185. Defendant ODOC voluntarily took the custody of Plaintiff under circumstances such as to deprive him of normal opportunities for protection and created a non-delegable duty to ensure that Plaintiff was provided necessary and timely medical care, including adherence to specialist recommendations, timely diagnostics, follow-up, and treatment. Defendants have repeatedly failed to meet their obligation to protect Plaintiff from known, obvious, and predictable risk of re-injury, ongoing pain and suffering, and additional damage from lack of treatment.

186. ODOC's conduct was and is unreasonable in light of the risk of harm to Plaintiff. ODOC controlled all aspects of Plaintiff's life. Plaintiff's harms could have easily been prevented if Defendants had provided proper auditory aids and access to outside medical diagnostics and treatments.

187. As a direct and proximate result of ODOC's negligence, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress. Plaintiff should be fully and fairly compensated for his damages in a sum that is determined by a jury.

## PRAYER FOR RELIEF

a. A sum which will fully compensate Plaintiff for his physical pain and suffering;

b. A sum which will compensate plaintiff for his emotional distress;

c. A sum which will fully compensate plaintiff for his economic losses;

d. An award of punitive damages;

e. For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 42 U.S.C.

§§ 1988 and 2000e-5;

f. Equitable relief; and

g. For such other and further relief as the Court may deem just and equitable.

Plaintiff demands trial by Jury.

Dated: 22 April 2026

**LAW OFFICE OF KATHARINE EDWARDS**

*s/Abby Greenfield*
Abby Greenfield, OSB No. 243463
abby@kedwards-law.com
Katharine Edwards, OSB No. 173393
attorney@kedwards-law.com
P.O. Box 417
Hillsboro, Oregon 97123
Telephone: (503) 664-0645
Of Attorneys for Plaintiff